11 So.3d 788 (2008)
Felicia D. BROWN, as dependent widow and personal representative of the estate of Jeremiah Brown, deceased
v.
ABUS KRANSYSTEME GMBH.
1071184.
Supreme Court of Alabama.
December 12, 2008.
*789 Thomas P. Willingham of Alvis & Willingham, L.L.P., Birmingham; and Allen Richard Stoner, Decatur, for appellant.
Jackson H. Ables III and Brandi M. Smith of Daniel Coker Horton & Bell, P.A., Jackson, Mississippi, for appellee.
*790 WOODALL, Justice.
Felicia D. Brown, as dependent widow and personal representative of the estate of Jeremiah Brown, deceased, appeals from a judgment dismissing for lack of in personam jurisdiction her product-liability action against ABUS Kransysteme GmbH ("ABUS"), a limited liability company organized under the laws of the Federal Republic of Germany and the manufacturer of the component part of a crane that allegedly malfunctioned, resulting in the death of her husband. We affirm.

I. Factual Background
On August 2, 2006, Jeremiah Brown was operating a crane for his employer Steel Related Technology New, LLC ("SRT"). The crane was manufactured by Wolverine Crane & Service, Inc. ("Wolverine"), a Michigan corporation, and was equipped with a hoist manufactured by ABUS bearing serial number 78838. He was killed when a wire rope on the hoist snapped, allowing a beam to fall on him. On October 4, 2006, Felicia Brown sued ABUS and others asserting claims under the Alabama Extended Manufacturer's Liability Doctrine and other theories.
On December 20, 2006, ABUS moved to dismiss the claims against it, arguing that it "lack[ed] minimum contacts with the State of Alabama sufficient to permit an exercise of in personam jurisdiction consistent with the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States." In support of its motion, ABUS filed the affidavit of Lothar Bühne, a managing partner of ABUS. The affidavit stated, in pertinent part:
"3. ABUS does not have any contacts with the State of Alabama.
"4. ABUS has no offices, factories, real or personal property, product inventory, bank accounts, or assets of any kind in the United States of America or in the State of Alabama.
"5. ABUS has no employees or regular agents anywhere in the United States of America and no employees or agents whatsoever in the State of Alabama.
"6. ABUS' sole representative on the North American continent is located in the Commonwealth of Canada, and only handles sales in Canada. ABUS has never had any sales representative relations with any person or entity in the State of Alabama.
"7. ABUS has not designed, manufactured for, or sold any ABUS product, including wire rope product, to the employer of plaintiff's decedent.
"8. ABUS did not send the crane or hoist product described in the complaint into the United States of America or into the State of Alabama.
"9. ABUS has had no contacts in or with or any presence in or any involvement with the State of Alabama.
"10. ABUS has never purposefully availed itself of any privilege, benefit or protection afforded by the laws of the State of Alabama."
On February 1, 2007, Brown moved to continue consideration of ABUS's motion to dismiss, asserting that resolution of the question of personal jurisdiction should be deferred until she could "conduct jurisdictional discovery." More specifically, Brown contended:
"[J]urisdictional discovery might shed information on how the ABUS hoist got to Alabama, whether it was designed for the American market, whether it was designed for the specific Alabama application for which it was being used, the extent of ABUS' `subsidiary and partner' distribution network in the United States, whether it or its network is servicing the Decedent's employer's needs, *791 and whether it is otherwise aiming its activities to a multi-state market that includes Alabama."
On March 7, 2007, the trial court granted Brown's motion.
On March 21, 2007, ABUS's counsel sent a letter to Brown's counsel; that letter states:
"Yesterday I received a copy of [Brown's] Amended Complaint and just today received a copy of [Brown's] First Set of Interrogatories and Requests for Production of Documents.... Given that ABUS has a pending motion to dismiss based on personal jurisdiction ABUS will not be participating in any discovery not relating to its personal jurisdiction defense."
(Emphasis added.)
On approximately April 10, 2007, Brown sent ABUS a "notice of [Ala. R. Civ. P.] 30(b)(6) deposition of corporate representative of defendant [ABUS] and request for production of documents under [Ala. R. Civ. P.] 30(b)(5)" (hereinafter "the deposition notice"). The deposition notice contained 50 paragraphs with subparagraphs describing the requested information and documents. Approximately 24 of the paragraphs sought information regarding the sales of ABUS's products "in the United States," as well as information regarding ABUS's business contacts "in the United States" or "in North America." Examples of these paragraphs are as follows:
"1. Testimony and documents regarding all relationships, agreements and/or contracts, including but not limited to distribution agreements, service contracts, and/or sales agreements, [ABUS has] with any natural person, corporation, partnership, proprietorship, association, organization, group of persons, or any governmental body or subdivision thereof, company or other business entity in the United States.

"....
"4. Testimony and documents related to the distribution of ABUS ... products, including any crane, hoist, gantry, accessory, component part, spare part, or other item manufactured, produced, designed and/or distributed by ABUS... or any of its subsidiaries, including but not limited to the ABUS ... crane/hoist which bears Serial Number 78838 (`the subject crane'), in the United States.

"5. Testimony and documents, including but not limited to invoices, receipts, sales records, sales ledgers, and/or electronically stored information, relating to the sales of ABUS Kransysteme GmbH products made to any natural person, corporation, partnership, proprietorship, association, organization, group of persons, or any governmental body or subdivision thereof, company or other business, in the United States.

"6. Testimony and documents which evidence, refer or relate to all payments received directly or indirectly, from any person, company or other business entity in the United States for the purchase of your products, including but not limited to the subject crane.
"7. Testimony and documents, including but not limited to all invoices, receipts, records, electronically stored information, or other documentation, regarding shipment, directly or indirectly, of your products to the United States."
(Emphasis added.) The deposition notice also sought "[t]estimony and documents, including but not limited to agreements and/or contracts, describing and/or reflecting [ABUS's] relationship with [EMH, Inc., an Ohio corporation, whose principal place of business is Cleveland, Ohio]."
*792 On approximately April 17, 2007, ABUS sent Brown a letter, stating, in pertinent part:
"In reviewing the proposed deposition topics, I noticed that a number of these topics have no relevance to any contacts of ABUS within the State of Alabama, and some of the other topics are in part not related to Alabama jurisdiction. Obviously, I will be filing objections to those topics and/or parts. If you disagree with those objections and want Judge Thompson[1] to review validity of those, I will be glad to cooperate with you in getting a hearing scheduled to address that before the deposition on jurisdictional contacts.
"....
"In view of this information, if you would like to revise the topic list and limit it to personal jurisdiction contacts only, instead of using the current topic list, ... the deposition can probably be expedited to some further degree."
(Emphasis in original.)
On May 25, 2007, ABUS filed a notice of objections to the deposition notice. Typical of the objections was the response to paragraph six, which stated, in pertinent part: "ABUS objects to the topic as overly broad insofar as it seeks information not relevant to alleged contacts by ABUS with the State of Alabama." (Emphasis added.)
On September 6, 2007, Brown took the deposition of Karl Rudolph Vom Stein, who was in charge of ABUS's exports. During the deposition, however, ABUS's counsel instructed Vom Stein not to answer questions from Brown's counsel regarding ABUS's nationwide sales or business operations. On September 27, 2007, Brown filed a motion to compel ABUS "to fully and completely respond to [her deposition notice]."
However, on November 19, 2007, before the trial court ruled on Brown's motion to compel, ABUS filed a 23-page affidavit of Vom Stein, in which, as Brown concedes, he "gave detailed facts ... concerning topics foreclosed by ABUS' counsel during his deposition." Brown's brief, at 20. According to Vom Stein, for example, the only entity in the United States authorized to sell ABUS's products is EMH, Inc. ("EMH"). The pertinent facts of the affidavit were succinctly summarized by the trial court as follows:
"[Vom Stein] identifie[d] hoist number 78838 as a model GM 7000 and state[d] that this ABUS model is not authorized for sale to anyone in the United States. In addition, Mr. Vom Stein reiterate[d] that neither ABUS, nor its sole distributor in the United States, [EMH], sold hoist number 78838 to any party to this civil litigation and that ABUS did not sell, deliver, install, service or maintain this hoist in the State of Alabama and did not sell any replacement parts for this hoist in the United States or the State of Alabama.
"Instead, according to Mr. Vom Stein, ABUS manufactured hoist number 78838 in Germany in the year 2000 pursuant to a special order by its former customer, Kaverit Steel and Cranes, Ltd. (hereinafter `Kaverit'), a Canadian-based crane manufacturer. Mr. Vom Stein further state[d] the sale of hoist number 78838 to Kaverit was transacted in Germany and that prior to this sale `it was agreed between ABUS and Kaverit, and Kaverit acknowledged in writing[,] that Kaverit would not resell ABUS products to any Kaverit customer in the United States of America.' ... Sometime after this sale, hoist number 78838 was acquired by Wolverine ... a crane *793 manufacturing company incorporated in the State of Michigan that markets its goods and services in the United States. Thereafter, Wolverine incorporated hoist number 78838 into a crane system that was installed at the [SRT] facility in the State of Alabama. In his affidavit, Mr. Vom Stein state[d] that ABUS did not sell hoist number 78838 to Wolverine and also state[d] his understanding based on information obtained in the course of this litigationthat Wolverine purchased this hoist from Kaverit.
"Mr. Vom Stein further state[d] that hoist number 78838 `was not manufactured in anticipation of a sale to any kind of purchaser in the State of Alabama' and that, at the time the hoist was manufactured for and sold to Kaverit, `ABUS did not contemplate that the purchase of an ABUS custom-ordered hoist by a Canadian crane manufacturer (who was forbidden to sell ABUS products to its own customers in the U.S.A.) would subject ABUS to a lawsuit in the State of Alabama.' In addition, Mr. Vom Stein state[d] that ABUS was not aware until after the initiation of this lawsuit that Kaverit had sold the hoist to Wolverine or that the hoist had been installed in a crane system located in the State of Alabama."
(Emphasis added; footnote omitted.)
Apparently, the "acknowledg[ment] in writing" to which the trial court referred, namely, "that Kaverit would not resell ABUS products to any Kaverit customer in the United States," is a document purporting to be the redacted version of a letter from Kaverit to ABUS, dated January 12, 1996 (hereinafter referred to as "the Kaverit letter"). The Kaverit letter, which was filed with Vom Stein's affidavit, states: "ABUS does not allow Kaverit to sell its products into the USA. We sell cranes into Washington, Oregon, California, Alaska, Idaho, Nevada, Montana, Utah, and Wyoming. We do not consider ABUS on any of these crane inquiries. This is madness, but we are following your rules."
On November 27, 2007, at a hearing on ABUS's motion to dismiss, the trial court ordered Brown to file a response to that motion. The next day, the court entered an order stating that it was taking "under advisement" Brown's motion to compel ABUS to respond to her deposition notice. Also that day, Brown filed a "preliminary response" to the motion to dismiss.
On December 20, 2007, the trial court entered an order denying Brown's motion to compel, but allowing her an additional 21 days to file a "final response" to ABUS's motion to dismiss. The order stated, in pertinent part:
"As to [Brown's] request that ABUS be required to tender a corporate representative to continue the noticed [Rule] 30(b)(6) deposition and to produce all the requested documents in her [Rule] 30(b)(5) request for production, the Court finds that [Brown] has failed to identify any specific area of inquiry or potentially responsive materials that if compelled would be `material to the disposition of the issue of personal jurisdiction.' See Ex parte Duck Boo Int'l Co., Ltd., 985 So.2d 900, 907 (Ala.2007).
"....
"Based on the allegations in [Brown's] complaint, the injury giving rise to this action was caused by an ABUS model GM 7000 wire rope hoist (serial number 78838) that was originally manufactured by ABUS and thereafter was installed in a crane system that was ultimately located and used on the premises of the defendant [SRT], located in Morgan County, Alabama.
"As to in personam jurisdiction based on specific contacts with Alabama, *794 [Brown] has not asserted that any outstanding testimony or materials responsive to her [Rule] 30(b)(6) and [Rule] 30(b)(5) notices will lead to evidence relevant to whether or not ABUS played a direct role, either acting on its own or through an authorized agent, in causing this hoist to be installed in a crane system or effecting the sale or delivery of this crane system to a facility located in Alabama."
(Emphasis added; footnote omitted.)
On January 4, 2008, Brown filed a brief in opposition to ABUS's motion to dismiss. In that brief, she conceded that this Court, in Ex parte Alloy Wheels International, Ltd., 882 So.2d 819 (Ala.2003), adopted the "stream-of-commerce-plus" test for in personam jurisdiction set out in Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion by O'Connor, J.) (hereinafter "the O'Connor plurality"). See Ex parte Duck Boo Int'l Co., 985 So.2d 900, 911 (Ala.2007). Brown argued, however, that the trial court should apply the more liberal "stream-of-commerce" test espoused in a second Asahi plurality, which was authored by Justice Brennan (hereinafter "the Brennan plurality"). According to Brown, the exercise of jurisdiction over ABUS was proper under the rule set out in the Brennan plurality.
On March 24, 2008, the trial court granted ABUS's motion to dismiss. In so doing, it declined Brown's invitation to depart from the binding precedent of Alloy Wheels and held that jurisdiction was lacking under the test adopted in that case. The court went further, however, and held:
"[E]ven if ABUS's [contacts with Alabama] were to be assessed according to the less stringent stream-of-commerce test articulated [by the Brennan plurality], the result in this case would be the same, that is, a finding that the assertion of jurisdiction over ABUS would exceed this court's powers under the Due Process Clause."
After the trial court certified that order as a final judgment pursuant to Ala. R. Civ. P. 54(b), Brown filed a timely notice of appeal.
Brown essentially makes three arguments on appeal. First, she contends that this Court should overrule Alloy Wheels and replace the test based on the O'Connor plurality with one based on the Brennan plurality as the framework for the exercise of personal jurisdiction in the stream-of-commerce context. Second, she argues that the record establishes the basis for jurisdiction over ABUS under the test of Alloy Wheels. Finally, in the alternative, she contends that the trial court exceeded its discretion in denying her motion to compel ABUS to fully respond to her deposition notice.

II. Discussion
"The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient `minimum contacts' with the forum state." Elliott v. Van Kleef, 830 So.2d 726, 730 (Ala.2002) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "The critical question with regard to the nonresident defendant's contacts is whether the contacts are such that the nonresident defendant `"should reasonably anticipate being haled into court"' in the forum state." Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting in turn World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
*795 Alabama recognizes two categories of in personam jurisdictiongeneral and specific. Alabama courts have general jurisdiction over a nonresident defendant if that defendant's activities in Alabama "`"are `substantial' or `continuous and systematic,' regardless of whether those activities give rise to the lawsuit."'" Ex parte Troncalli Chrysler Plymouth Dodge, Inc., 876 So.2d 459, 463 (Ala.2003) (quoting Ex parte Dill, Dill, Carr, Stonbraker & Hutchings, P.C., 866 So.2d 519, 525 (Ala. 2003), quoting in turn Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala.1998)). Our courts have "`"specific jurisdiction when a defendant has had few contacts with the forum state, but those contacts gave rise to the lawsuit."'" 876 So.2d at 463 (quoting Ex parte Dill, 866 So.2d at 525, quoting in turn Leventhal, 723 So.2d at 569). "Furthermore, this Court has held that, for specific in personam jurisdiction, there must exist `a clear, firm nexus between the acts of the defendant and the consequences complained of.'" Elliott v. Van Kleef, 830 So.2d at 731 (quoting Duke v. Young, 496 So.2d 37, 39 (Ala.1986)).
"[T]he stream of commerce theory provides a valid basis for finding requisite minimum contacts." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1566 (Fed.Cir.1994). It is widely regarded as a basis for asserting specific jurisdiction. See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 788 (7th Cir.2003); Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 203 (3d Cir.1998); and Matthews v. Brookstone Stores, Inc., 469 F.Supp.2d 1056, 1064 (S.D.Ala.2007).

A. Standards of Review
"`[T]he plaintiff bears the burden of proving the court's personal jurisdiction over the defendant.'" Ex parte Dill, 866 So.2d at 525 (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir.2002)). "An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction." Elliott, 830 So.2d at 729. "[I]f the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, `the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof ....'" Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala.2004) (quoting Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D.Ala.2002)).
"`The trial court has broad and considerable discretion in controlling the discovery process and has the power to manage its affairs ... to ensure the orderly and expeditious disposition of cases.'" Ex parte Vulcan Materials Co., 992 So.2d 1252, 1259 (Ala.2008) (quoting Salser v. K.I.W.I., S.A., 591 So.2d 454, 456 (Ala. 1991)). "Therefore, this Court will not interfere with a trial court's ruling on a discovery matter unless this Court `"determines, based on all the facts that were before the trial court, that the trial court clearly [exceeded] its discretion."'" Id. (quoting Ex parte Henry, 770 So.2d 76, 80 (Ala.2000), quoting in turn Ex parte Horton, 711 So.2d 979, 983 (Ala.1998)).

B. The Applicability of the Stream-of-Commerce Theory and Alloy Wheels
Brown insists that the test adopted in Alloy Wheels conflicts with an opinion of the United States Supreme Court, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), which she characterizes as "binding precedent." She urges this Court to overrule Alloy Wheels. We decline to do so, because this case involves neither the *796 stream-of-commerce theory of the Brennan plurality nor the stream-of-commerce-plus theory of the O'Connor plurality as adopted in Alloy Wheels.
The source of both versions of the stream-of-commerce doctrine, which divided the Asahi Court, is dictum in World-Wide Volkswagen Corp. v. Woodson. In Woodson, New York residents Harry Robinson and Kay Robinson purchased a new Audi automobile from Seaway Volkswagen, Inc. ("Seaway"), a retail dealer in Massena, N.Y. 444 U.S. at 288, 100 S.Ct. 559. The regional distributor for Audi automobileswhich served the states of New York, New Jersey, and Connecticutwas World-Wide Volkswagen Corporation ("World-Wide"). Id. at 288-89, 100 S.Ct. 559. The automobile was manufactured by Audi NSU Auto Union Aktiengesellschaft ("Audi") and was imported by Volkswagen of America, Inc. ("Volkswagen"). 444 U.S. at 288, 100 S.Ct. 559.
The following year, the Robinsons were driving through Oklahoma when their automobile collided with another vehicle. The impact created a fire, and Kay Robinson and the Robinsons' two children were injured. "The Robinsons subsequently brought a products-liability action in the District Court for Creek County, Okla., claiming that their injuries resulted from defective design and placement of the Audi's gas tank and fuel system." 444 U.S. at 288, 100 S.Ct. 559. Defendants named in the suit were (1) Seaway, (2) World-Wide, (3) Audi, and (4) Volkswagen. Id.
The New York defendants, Seaway and World-Wide, contested the exercise of personal jurisdiction over them in Oklahoma. Specifically, they sought a writ of prohibition restraining the trial judge "from exercising in personam jurisdiction." 444 U.S. at 289, 100 S.Ct. 559. From the denial of that relief in the Oklahoma Supreme Court, they sought certiorari review in the United States Supreme Court.
The United States Supreme Court reversed the judgment of the Oklahoma Supreme Court, holding that the unilateral activity of the New York residents in driving a car they had purchased from a New York retailer to Oklahoma did not constitute contacts sufficient to subject the New York retailer and distributor to suit in Oklahoma. 444 U.S. at 299, 100 S.Ct. 559. In the course of its discussion, the Court stated:
"[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Cf. Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961)."
444 U.S. at 297-98, 100 S.Ct. 559 (emphasis added).
This language in Woodson has been correctly characterized as dicta, because there was in Woodson no such manufacturer or importer before the Court contesting jurisdiction. See Nelson v. Park Indus., Inc., 717 F.2d 1120, 1124-25 (7th Cir.1983); Spartan Motors, Inc. v. Lube Power, Inc., 337 Ill.App.3d 556, 564, 786 N.E.2d 613, 620, 272 Ill.Dec. 74, 81 (2003); Ruckstuhl v. Owens Corning Fiberglas Corp., 731 So.2d 881, 887 (La.1999); Juelich v. Yamazaki *797 Mazak Optonics Corp., 682 N.W.2d 565, 571 n. 4 (Minn.2004); and Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 201 (Tex.1985).
Nevertheless, the language served as the foundation for both plurality opinions in Asahi. The point of disagreement between the authors of those plurality opinions was whether jurisdiction may turn on the mere "foreseeability" that the seller's product would "enter the forum state." Asahi, 480 U.S. at 111-12, 107 S.Ct. 1026 (due process requires "something more" than mere foreseeability (per O'Connor, J.)); 480 U.S. at 117, 107 S.Ct. 1026 (defendant need only be "aware that the final product is being marketed in the forum State" (per Brennan, J.)).
Thus, the stream-of-commerce doctrine contemplates that the offending product will have been sold by a "participant in the process" with, at a minimum, the "awareness that the stream of commerce may or will sweep the product into the forum State." 480 U.S. at 116-17, 107 S.Ct. 1026 (Brennan, J.). "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." Asahi, 480 U.S. at 117, 107 S.Ct. 1026 (Brennan, J.) (emphasis added).
In this case, the subject hoist found its way into Alabama, not by a "regular and anticipated flow," but through "unpredictable currents or eddies." It was a model that was not authorized for sale in the United States. Based on Vom Stein's affidavit and deposition, the trial court found that neither Kaverit, ABUS's customer in Canada, nor EMH, ABUS's American distributor in Ohio, was authorized to sell the GM 7000 model hoist in the United States. Instead, Kaverit purchased the hoist in Germany with the understanding that it would not place it in the stream of commerce in the United States. In spite of this agreement, Kaverit apparently sold the hoist to Wolverine, which, in turn, incorporated it into the crane system that was installed at the SRT job site where Brown's husband was working. Under these uncontroverted facts, ABUS had no "awareness that the stream of commerce [might] or [could] sweep the product into [Alabama]." Asahi, 480 U.S. at 116-17, 107 S.Ct. 1026 (Brennan, J.).
The hoist was, therefore, not within the stream of commerce, as defined by any test proposed in Asahi. See Simeone v. Bombardier-Rotax GmbH, 360 F.Supp.2d 665, 672 (E.D.Pa.2005) (plaintiffs in a product-liability action against the foreign manufacturer of airplane engines could not assert in personam jurisdiction under the stream-of-commerce theory, where the particular engine that was the subject of the action had not entered the United States through the distribution channels the manufacturer had established to serve the market in the United States, there being no connection "between the activities that [the manufacturer] purposefully directed at Pennsylvania and the accident that ultimately occurred"). It is fundamental that "the Due Process Clause... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." Woodson, 444 U.S. at 297, 100 S.Ct. 559.
Although this Court does not currently operate within the framework of the Brennan plurality, see Alloy Wheels, supra, it recently signaled a willingness to revisit the issue in the appropriate case. See Ex parte Duck Boo, 985 So.2d at 911-12. According to Brown, this is such a case; we disagree.
*798 Alloy Wheels was a typical stream-of-commerce case. The foreign defendant contesting jurisdiction manufactured aluminum alloy wheels in the United Kingdom ("the UK"). 882 So.2d at 825. Those wheels were installed on Landrover Discovery sport-utility vehicles in the UK. Id. Nevertheless, the manufacturer anticipated that some of its wheels would be used on "`vehicles to be exported to the United States.'" 882 So.2d at 824. Indeed, one such vehicle was involved in an automobile accident that formed the basis of the plaintiff's product-liability action against the foreign manufacturer. Thus, the offending product in that case was placed within the stream of commerce. For these reasons, the jurisdictional discussions in Alloy Wheels and Ex parte Duck Boo shed little light on this case.
In short, Brown's theory of jurisdiction over ABUSthe stream-of-commerce doctrine is inapplicable. For all that appears, the subject hoist was the only specimen of the GM 7000 model that ever entered the United States. Thus, because the accident arose out of a single contact that is functionally irrelevant under the stream-of-commerce doctrine, that contact affords an insufficient basis for jurisdiction over ABUS.

C. Motion to Compel
Alternatively, Brown contends that the trial court exceeded its discretion in denying her motion to compel ABUS to fully respond to her deposition notice. She asks this Court to "reverse the trial court and remand this case with instructions to allow [her] to retake the deposition of [Vom Stein] on the topics set forth in her notice and to conduct any and all follow-up jurisdictional discovery that is necessary." Brown's reply brief, at 24 (emphasis added).
Although Brown was ultimately allowed to depose Vom Stein, she contends that ABUS's counsel improperly interfered with her deposition, in violation of Ala. R. Civ. P. 26(b) and 30(c). More specifically, she contends that ABUS's counsel improperly instructed Vom Stein not to answer questions pertaining to ABUS's nationwide sales or business operations and that ABUS's counsel made "speaking objections" and otherwise improperly coached Vom Stein during the deposition. According to Brown, questions regarding "ABUS' contacts with the United States and within North America" were proper, because, she insists, "such discovery was reasonably calculated to lead to the discovery of facts regarding ABUS' contacts with Alabama." Brown's brief, at 46.
However, Brown bears the burden of "show[ing] that the outstanding discovery is material to the disposition of the issue of personal jurisdiction." Ex parte Duck Boo, 985 So.2d at 907. She has failed to make such a showing.
After Vom Stein's deposition, ABUS filed materials relevant to Brown's stream-of-commerce theory of jurisdiction, including a lengthy affidavit from Vom Stein.[2] These materials clearly show that Brown's theory of jurisdiction is unavailable in this case, as discussed in Part II.B. of this opinion. Thus, assuming, without deciding, that ABUS's counsel improperly interfered with Brown's deposition of Vom Stein, Brown has failed show howin light of the information subsequently admitted through the deponentthe answers precluded by the interference were material.
In this connection, Brown focuses on the activities of EMH and its relationship with ABUS. More specifically, she states: *799 "ABUS admits that it supplies products to EMH, which shows that it knows that the ABUS products will flow into the American market. ABUS' own testimony and distributorship agreement both establish that [EMH] was to aggressively market and sell its products in all states, including the State of Alabama." Brown's brief, at 60.
However, the activities of EMH and its relationship with ABUS are inapposite. It is undisputed that neither the activities of EMH nor or its relationship with ABUS had any bearing on this accident. Instead, the record establishes conclusively that the product at issue was not authorized for sale in the United States by EMH. The fact that EMH distributes some types of ABUS products in the United States does not supply a nexus to this case, where EMH did notand could notsell the product model that allegedly caused the accident. See Simeone v. Bombardier-Rotax GmbH, 360 F.Supp.2d at 672.
The questions Brown proposes to ask Vom Stein on any remand of this case incorrectly presuppose the applicability of her stream-of-commerce theory. She cites a number of such cases, which, she says, stand for the proposition that "ABUS' contacts with the rest of the United States is relevant because it could lead to evidence of contacts with Alabama." Brown's brief, at 51. In particular, her brief includes the following quote from Hanamint Corp. v. Alliant Marketing Group, LLC, 481 F.Supp.2d 444, 447 (M.D.N.C.2007):
"`The analytical tool useful in cases in which the defendant's contacts are the result of establishing a distribution network in the forum State for the sale of defendant's products is generally referred to as the "stream of commerce" theory.'

"Viam Corp. [v. Iowa Export-Import Trading Co.,] 84 F.3d [424], 427 [(Fed.Cir.1996)]. `Under this theory, a defendant has minimum contacts with the forum when it purposefully ships a product into the forum [S]tate through an "established distribution channel."' Akeva L.L.C. v. Mizuno Corp., 199 F.Supp.2d 336, 339 (M.D.N.C.2002) (citing Beverly Hills [Fan Co. v. Royal Sovereign Corp.,] 21 F.3d [1558,] 1565 [(Fed.Cir.1994)]).
"In determining what constitutes an established distribution channel, it is sufficient that the defendant `[arrange] for [the] introduction of [a product] into the United States stream of commerce with the expectation (or at least the intention and hope) that [the product] will be shelved and sold at numerous local outlets in diverse parts of the country.' Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd., 647 F.2d 200, 203 (D.C.Cir. 1981) (quoted and cited with approval by the Federal Circuit in Beverly Hills, 21 F.3d at 1567). Indeed, it is not required that a foreign defendant exercise control of the distributing agent in order to show that an established distribution channel exists."
(Emphasis added.)
Brown also cites Clune v. Alimak AB, 233 F.3d 538 (8th Cir.2000), which, she says, is "[d]irectly on point." Brown's brief, at 48. From Clune, Brown quotes:
"The record shows that [the Swedish manufacturer] did not seek to limit the states or regions where their construction hoists would be sold. Rather, it utilized distributors that had sales territories across the United States. A foreign manufacturer that successfully employs a number of regional distributors to cover the United States intends to reap the benefits of sales in every state where the distributors market. Similarly, a foreign manufacturer that successfully *800 employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market. The difference is one of form, not function, and the practical effect is the same.
"We are not persuaded by [the manufacturer's] argument that it was unaware of what happened to its products after they left Swedish port. `[S]uch ignorance defies reason and could aptly be described as "willful."' Barone [v. Rich Bros. Interstate Display Fireworks Co.], 25 F.3d [610,] 614 [(8th Cir.1994)]. See also id. at 613 n. 4 (explaining how the distinction between what the defendant knew and should have known is immaterial to the personal jurisdiction analysis). If we were to conclude that despite its distribution system, [the manufacturer] did not intend its products to flow into Missouri, we would be bound to the conclusion that the company did not intend its products to flow into any of the United States."
233 F.3d at 544.
Brown's reliance on these and similar cases is inapposite, because they are, in fact, stream-of-commerce cases. Hanamint involved the distribution of allegedly patent-infringing products in the United States by means of a distribution system authorized by the foreign manufacturers/sellers. 481 F.Supp.2d at 448. The offending product in Clune, a "construction hoist," was one of many such hoists sold in the United States through a distribution system authorized by the foreign manufacturer. 233 F.3d at 540.
Here, the unequivocal testimony of Vom Stein establishes that the subject hoist was not designed or manufactured for distribution in the United States market and that ABUS never agreed to, or authorized, the sale of the hoist in the United States. The trial court recognized the fundamental distinction between actual stream-of-commerce cases and this case, in which ABUS's authorized sales in the United States and North America through EMH have nothing to do with the accident at the SRT job site or the subject hoist.[3] Consequently, Brown has failed to demonstrate how further inquiry into those authorized sales would be reasonably calculated to lead to the discovery of evidence relevant to her purported basis of jurisdiction over ABUS in Alabama. The trial court did not, therefore, exceed its discretion in denying Brown's motion to compel.

III. Conclusion
In summary, Brown's theory of jurisdiction is unavailable. She has failed to show that ABUS had the requisite minimum contacts for the assertion of in personam jurisdiction, and she has failed to show that the trial court exceeded its jurisdiction in denying her motion to compel ABUS to respond to further discovery. Consequently, the judgment of the trial court is affirmed.
AFFIRMED.
COBB, C.J., and SEE, LYONS, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., dissents.
MURDOCK, Justice (dissenting).
I disagree with the analysis regarding the motion to compel, as set out in Part II.C. of the main opinion. The holding that Brown was not entitled to complete jurisdictional discovery, particularly the deposition of a representative of ABUS, hinges on the finding that this is not an "actual stream-of-commerce case[]." 11 *801 So.3d at 800. Information relevant to whether this case is in fact an "actual stream-of-commerce case," however, is the type of information into which Brown legitimately was attempting to inquire in her discovery efforts, including her deposition of ABUS's corporate representative. The only basis we now (post-deposition) have for finding that this is not an actual stream-of-commerce case is a set of statements from the same corporate representative prepared and given in the form of an affidavit after he, with the aid of counsel, refused to have his testimony as to this issue properly elicited and tested by cross-examination in his deposition.[4]
I therefore respectfully dissent.
NOTES
[1] Judge Glenn Thompson is the circuit judge presiding over this case.
[2] Brown concedes that ABUS eventually "gave other information that it precluded questioning about during the deposition." Brown's reply brief, at 14.
[3] To be sure, at the time Brown was attempting to depose Vom Stein, the distinction was not apparent. The distinction has been clearly revealed, however, by Vom Stein's affidavit and the Kaverit letter.
[4] The main opinion states that it is only based on Vom Stein's affidavitand not his deposition testimonythat we now know that ABUS-authorized sales of hoists through EMH, Inc., into the United States had nothing to do with the particular hoist by which Brown's husband was injured.

It is also worth noting that the "stream of commerce" argument made by Brown arguably could allow for in personam jurisdiction over ABUS if, because of the flow of the stream of commerce, a significant number of ABUS's hoists were used in Alabama. See generally Ex parte Phil Owens Used Cars, Inc., 4 So.3d 418, 428 (Ala.2008) (Murdock, J., concurring in the rationale in part and concurring in the result) ("Neither party has argued for a modification of the elements of specific jurisdictionor for a hybrid of general and specific jurisdictionto be applied to determine whether the assertion of personal jurisdiction in this case would comport with constitutional standards of fairness.". See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (`Absent any briefing on the issue, we decline to reach the questions (1) whether the terms "arising out of" and "related to" describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists. Nor do we reach the question whether, if the two types of relationship differ, a forum's exercise of personal jurisdiction in a situation where the cause of action "relates to," but does not "arise out of," the defendant's contacts with the forum should be analyzed as an assertion of specific jurisdiction.'); Ex parte Kamilewicz, 700 So.2d 340, 345 n. 2 (Ala. 1997); Linda Sandstrom Simard, Hybrid Personal Jurisdiction: It's Not General Jurisdiction, or Specific Jurisdiction, but Is It Constitutional?, 48 Case W. Res. L.Rev. 559, 582 (1998); William M. Richman, Jurisdiction in Civil Actions, 72 Cal. L.Rev. 1328, 1345 (1984); Arthur T. von Mehren & Donald T. Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L.Rev. 1121 (1966)."). See Ex parte Duck Boo Int'l Co., Ltd., 985 So.2d 900 (Ala.2007) (declining to revisit previous holdings regarding the nature of contacts necessary to establish in personam jurisdiction on the ground that discovery as to the nature and extent of contacts between the defendant and the forum state had not been completed).